## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| CLARA JEAN DOSS ELLIOTT, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 5:13-CV-01717-KOB |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On October 13, 2010, the claimant, Clara Jean Doss Elliott, protectively applied for widow's insurance benefits under Title II and supplemental security income under Title XVI of the Social Security Act. The claimant initially alleged disability commencing on January 15, 2003 because of ankle, knee, wrist, and lower back pain, as well as arthritis. (R. 39-42, 162-68). The claimant later amended her alleged onset date to October 13, 2010. (R. 26). The Commissioner denied the claim on February 23, 2011. (R. 45-49). The claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ held a hearing on June 14, 2012. (R. 23-38, 50).

In a decision dated July 24, 2012, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for social security benefits. (R.

1

8-18). On July 15, 2013, the Appeals Council denied the claimant's request for review. (R. 1-4). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. (R. 1-3). The claimant has exhausted her administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUE PRESENTED

The claimant presents the following issue for review: whether the ALJ properly assessed the claimant's credibility and subjective complaints of pain.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if her factual conclusions are supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims.*"  Walker*, 826 F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the

nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[1]; 20 C.F.R. §§ 404.1520, 416.920.

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* (1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). The ALJ may consider the claimant's daily activities in evaluating and discrediting complaints of disabling pain. *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

If the ALJ decides to discredit the claimant's testimony as to her pain, she must articulate explicit and adequate reasons for that decision; failure to articulate reasons for discrediting claimant's testimony requires that the court accept the testimony as true. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995). A reviewing court will not disturb a clearly articulated credibility finding with supporting substantial evidence in the record. *Id.* at 1562.

---

[1]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See, e.g., Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

## V. FACTS

The claimant was 54 years old at the time of the ALJ's final decision. (R. 89). The claimant has a fifth grade education and past relevant work as a fast food worker and a plastics trimmer. (R. 27, 37, 164, 183). The claimant alleges disability based on ankle, knee, wrist, and lower back pain, as well as arthritis. (R. 162-68).

*Physical Impairments*

On June 14, 2010, the claimant visited Birmingham Health Care for a follow-up on her hypertension.[2] She complained of arthritis pain in her wrists, arms, hips, and back. At this visit, the claimant weighed 214 pounds at a height of 5'7". The claimant's treating source at Birmingham Health Care[3] noted that the claimant had no edema, no clubbing, and no cyanosis in her extremities. The treating source also noted that the claimant had normal gait and normal and mild tightness of both CMC (carpometacarpal) joints in both hands. The treating source diagnosed the claimant with benign essential hypertension and osteoarthritis of the first metatarsalphalangeal joint. At this visit, Amin Islam, a physician assistant at Birmingham Health Care, prescribed the claimant Enalapril, a medication used to treat high blood pressure, and Ibuprofen. On June 28, 2010, the claimant visited Birmingham Health Care for a refill on her Enalapril and Ibuprofen prescriptions. At this visit, the claimant's treating source noted that she had swelling of the carpometacarpal joints. (R. 233-38).

---

[2] No records exist from Birmingham Health Care before June 14, 2010. The report from this date indicates that the claimant's visit was a follow-up on her hypertension, but the report does not provide any information about prior visits.

[3] The providers' signatures on the claimant's records from Birmingham Health Care are illegible.

5

On November 15, 2010, Sharon Elliott Hand[4] completed a function report on behalf of the claimant. In this report, Ms. Hand indicated that on a normal day, the claimant wakes up, makes coffee, takes a shower, makes breakfast, watches TV, washes clothes or dishes if needed, makes dinner, and then lays in bed watching TV until she falls asleep. Ms. Hand further stated that at night, the claimant wakes up every few hours to take pain pills. Ms. Hand indicated that the claimant is capable of preparing her own quick meals and doing household chores, such as laundry and washing dishes. Ms. Hand indicated that the claimant does not drive because she does not have a car or license and cannot see very well. Ms. Hand stated that the claimant's hobbies include watching TV and playing cards, and that she goes out every other week to her daughter's house or to the grocery store. Ms. Hand reported that the claimant has trouble with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentration, and using her hands. Specifically, Ms. Hand wrote that the claimant could only lift ten to twenty pounds, could only walk one block, could not sit in one position for long, and could not kneel at all. Ms. Hand stated that the claimant could not follow written instructions because she could not read well, but that she could follow spoken instructions. (R. 169-78).

On November 15, 2010, Ms. Hand also completed a Work History Report on behalf of the claimant. In this report, Ms. Hand indicated that the claimant had previously worked as a fast food worker, a cashier, and a plant worker. In the fast food positions, the claimant's primary responsibilities included making sandwiches, running the grill, and cooking french fries. In these

---

[4] The record does not indicate Ms. Hand's relationship to the claimant. The court suspects that both Sharon Elliott Hand and Charles Hand, mentioned on the following page, are relatives of the claimant.

positions, Ms. Hand indicated that the claimant would have to lift large bags of flour, large boxes

of meat, and bags of fries, and carry them somewhere between fifteen to thirty feet, three to ten

times a day. As a cashier, the claimant ran the cash register and unloaded large boxes from trucks

and put the items on the shelves daily. As a plant worker, Ms. Hand indicated that the claimant

was responsible for trimming excess plastic, loading items onto lifts, and adding color to the

plastic machines. Ms. Hand stated that the claimant would constantly lift large boxes of plastic

and lift five-gallon buckets of color and pour the color into the machines around 25 times a shift.

(R. 183-90).

On December 9, 2010, Charles Hand completed a Third Party Drug and Alcohol Use

Questionnaire. In this questionnaire, Mr. Hand indicated that the claimant was on drugs for a

little over a year and went to prison for her drug use, but that she no longer used any drugs or

alcohol. (R. 196-97). The claimant also completed a Drug and Alcohol Use Questionnaire and

indicated the same facts regarding her drug use. She indicated that she used drugs in the past and

went to prison for manufacturing a controlled substance, but stopped using drugs in July of 2009.

(R. 199-200).

On December 17, 2010, the claimant visited the emergency room at Cooper Green

Hospital, complaining that she had experienced hip pain for eight months or longer that was

getting worse. The claimant's treating source[5] diagnosed her with arthralgia in her left hip and

noted that her gait was impaired. (R. 242-45).

At the request of the Social Security Administration, Dr. Marlin D. Gill performed a

_____

[5] The providers' signatures on the claimant's records from Cooper Green Hospital are
illegible.

7

consultative examination of the claimant on February 17, 2011. Dr. Gill noted that the claimant complained of lower back pain. Dr. Gill reported that the claimant did not currently have a treating doctor and was not taking any medications for her back condition. He noted that the claimant took over-the-counter BC Powders or Goody Powers for her pain occasionally. Dr. Gill stated that the claimant also complained of multiple joint pains, but that no physician had ever evaluated the claimant for this condition. He stated that the claimant also had problems with hypertension and had a history of polysubstance abuse, but had not used drugs for a year. At this visit, the claimant was 231 pounds at a height of 5'7". (R. 268-70).

Dr. Gill further noted that the claimant's gait was normal and that she walked without the assistance of an ambulatory device. He reported that the claimant had a full range of motion in her joints and her arm strength was 5/5 bilaterally. He noted that her hands were normal, with no joint tenderness, no bone or joint deformities, the ability to form a full fist and oppose her thumb to all fingertips bilaterally, and a grip strength of 4-5/5 bilaterally. Dr. Gill reported that the claimant's back looked normal and was not tender, that she could bend forward to 70 degrees, come back up erect, and rotate 20 degrees bilaterally. Dr. Gill noted that her legs appeared normal and symmetrical with good muscle tone. He also reported that from the supine position, the claimant could lift her legs off the exam table with no difficulty, and that her leg strength was 5/5 bilaterally. Dr. Gill noted that, although the claimant complained of hip pain, her hips were nontender, and she was able to flex them to 100 degrees and extend to 0 bilaterally.  Dr. Gill noted that the claimant also complained of discomfort with knee movement, but stated that her knees appeared normal, and that she did not have bone or joint deformity or swelling. Dr. Gill noted that the claimant was capable of flexing her knees to 130 degrees and extending them to 0

bilaterally. He stated that from the standing position, the claimant could squat down half way and come back up again holding onto the table. Dr. Gill reported that the claimant was also capable of walking across the room on her tiptoes and heels. (R. 270).

An x-ray taken at this visit indicated severe degenerative disc disease at L5-S1. Dr. Gill noted that the claimant's other discs appeared well-preserved. He also indicated that the x-ray showed bilateral facet arthrosis at L5 and no other bony abnormalities. (R. 270).

At the request of the Social Security Administration, Dr. Robert Estock performed a psychiatric review of the claimant on February 23, 2011. Dr. Estock did not examine the claimant in person, but completed his assessment based on the claimant's medical records. Dr. Estock concluded that the claimant had no medically determinable impairment. Dr. Estock noted that the claimant reported a history of polysubstance abuse and was incarcerated for manufacturing and using drugs, but now claimed that she no longer used drugs or alcohol. (R. 246-58).

Dr. Estock concluded that the objective medical evidence did not support a diagnosis of either substance abuse or any other mental impairment. Furthermore, Dr. Estock noted that the claimant had not reported any symptoms or functional limitations resulting from a mental impairment. Dr. Estock indicated that the claimant had complained of difficulty with concentration, but that she had attributed this difficulty to her severe pain, not to a mental condition. Consequently, Dr. Estock concluded that the claimant did not have a medically determinable impairment and did not recommend any limitations in the claimant's basic work activity because of any potential impairments. (R. 246-58).

On February 23, 2011, Dr. Robert H. Heilpern also completed a physical residual functional capacity assessment on the claimant at the request of the Social Security

Administration. Dr. Heilpern similarly did not evaluate the claimant in person, but based his conclusions on the claimant's medical records. Dr. Heilpern found that the claimant could occasionally lift twenty pounds; could frequently lift ten pounds; could stand or walk about six hours of an eight-hour work day; could sit with normal breaks for a total of about six hours in a eight-hour workday; and could push or pull without limits. Dr. Heilpern noted that the claimant could frequently climb ramps and stairs and balance; could occasionally stoop, kneel, crouch, and crawl; and could never climb ladders, ropes, or scaffolds. Dr. Heilpern also stated that the claimant should avoid concentrated exposure to extreme cold, and all exposure to unprotected heights, open bodies of water, and hazardous machinery. Dr. Heilpern concluded that the claimant's medically determinable impairments could reasonably produce some of her alleged symptoms and functional limitations; however, her statements were only partially credible in light of the fact that her allegations were not consistent with the objective medical evidence on file.  Specifically, Dr. Heilpern cited the claimant's full range of motion of the bilateral hands, strength of 4-5/5 in her hands, ability to create a full fist, and lack of evidence of joint tenderness or deformity as objective evidence in conflict with the claimant's allegations. Dr. Heilpern also stated that the claimant's ability to cook, clean, do laundry, and wash dishes supported his conclusions about the claimant's ability to perform basic work. (R. 260-67).

The claimant's records indicate that she occasionally visited the Good Samaritan Health Clinic for treatment of her impairments from February 2011 to May 2012.  On February 25, 2011, nurse practitioner Carol Livingston noted that the claimant had severe hypertension, for which she was not receiving treatment. Ms. Livingston prescribed Lisinopril, a medication used to treat high blood pressure, and HCTZ, or hydrochlorothiazide, a diuretic used to treat

hypertension. Ms. Livingston also noted that the claimant had arthralgia, or joint pain, in her back, knees, and ankles. (R. 290).

On March 31, 2011, the claimant's daughter called Good Samaritan Health Clinic requesting to pick up the claimant's medications because the claimant was in jail. Good Samaritan informed the claimant's daughter that she should let the jail handle her mother's medical treatment. No medical records exist from the jail during the claimant's incarceration. (R. 289).

On July 7, 2011, once the claimant was released from jail, she visited Good Samaritan Health Clinic again. Nurse practitioner Carol Livingston noted that the claimant was now off her medications and would have to restart her treatment plan. Ms. Livingston again prescribed the claimant Lisinopril and HCTZ. (R. 287-88).

On July 28, 2011, Ms. Livingston noted that the claimant alleged that she had been suffering from daily headaches for about a year. Ms. Livingston substituted Accupril for the claimant's Lisinopril and also prescribed the claimant Atenolol for her high blood pressure and Tramadol (the generic version of Ultram) for her pain.

On August 26, 2011, Ms. Livingston noted that the claimant still complained of having headaches, but said she did not have as many. Ms. Livingston noted that she did not want to give the claimant Triptan, a medication used to treat migraines. Ms. Livingston instead put the claimant on a trial of Neurontin, a drug used to relieve nerve pain. On September 9, 2011, Ms. Livingston noted that the claimant indicated that the Neurontin prescription helped her more than the Tramadol, but that she still had frequent headaches and pressure around her eyes. (R. 281-86).

On March 23, 2012, Ms. Livingston noted that the claimant was non-compliant with her treatment because she had not picked up her Accupril or Neurontin prescriptions. Ms. Livingston restarted the claimant on these prescriptions at this visit. On April 24, 2012, the claimant visited Good Samaritan again, complaining of a tight chest, coughing, allergies, and pain in the back of her knees that was not relieved by Tylenol or Aleve. At this visit, Ms. Livingston prescribed Norvasc for the claimant's high blood pressure and Cyclobenzaprine for her muscle spasms. On May 8, 2012, Ms. Livingston noted that the claimant's hypertension was at goal and substituted Methocarbonal for the claimant's Cyclobenzaprine. (R. 273-80).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insured benefits, the claimant requested and received a hearing before an ALJ. (R. 50, 53-55). At the hearing, the claimant testified that she previously worked as a biscuit cook at Hardee's. Prior to this position, the claimant worked as mold machine operator, running a machine that made various plastic items. The claimant testified that she also worked for this company as a floor person "that pulled the merchandise after they got it stacked on a dolly and pulled it down, about the length of a football field." The claimant testified that the heaviest thing she lifted in this position was at least 75 pounds. The claimant also indicated that she worked at Fred's retail store and Jack's fast food restaurant as a cook. At Fred's, the claimant indicated that she lifted boxes that were around 50 to 75 pounds. At Jack's, the claimant indicated that the heaviest things she lifted were around 50 pounds, if not a little more. (R. 27-29).

The claimant indicated she did not drive because she did not have a current driver's license.  She testified that she did not need any help taking care of her personal needs, such as

getting dressed and putting on socks or shoes, but had difficulty sometimes. (R. 29-30).

The claimant testified that, when she wakes up, she will make breakfast, and then go back to sitting and watching TV; that she then makes a sandwich for lunch and makes dinner, by either microwaving her food or by cooking something in the oven; and that she spends most of her day on the couch or in the recliner. The claimant further testified that she does not read or have any hobbies and just sits in her recliner and watches TV all day; she occasionally visits her daughter, but that she does not stay out that long and usually her daughter just comes to visit her; she can go shopping for about twenty minutes and then has to sit down because she would have throbbing pain in her lower back, feet, and knees. The claimant stated that standing in one spot was harder for her than walking, and that she could sit upright in a chair for about thirty minutes before she would have to get up and move or change positions. (R. 30-31).

The claimant testified that she was not capable of lifting a case of 24 cans of Coke, but could lift a gallon of milk; her granddaughter does most of the laundry, but that every once in a while, she does a load herself; when walking up the four stairs on the porch to her house, she has to hold onto the rails; she cannot squat or bend down to pick things up off the floor, but did not have any problems with getting things out of the kitchen cupboards. She testified that she did have trouble washing her hair sometimes, but does not have any trouble holding onto small items such as forks, pens, or the remote control, and did not have trouble holding larger items like a glass or the doorknob. (R. 32-34).

The claimant also testified that she takes medicine for blood pressure, allergies, and headaches, as well as a prescription for muscle spasms in her back and a generic Ultram prescription for her pain. The claimant indicated that the Ultram helps some with her pain. The

13

claimant stated that she takes the Ultram every day, but just takes the muscle spasm medicine on bad days; a doctor at Good Samaritan prescribed these medications, but she did not know the doctor's name.  She used to go to Good Samaritan once every two weeks to a month for problems with her blood pressure, but that her blood pressure was now under control, and she only had one future appointment at Good Samaritan. The claimant testified that the doctors at Good Samaritan had not recommended to her any kind of additional treatment or exercises that she could do to strengthen her back. (R. 34-35).

A vocational expert, Ms. GleeAnn Kehr,[6] testified concerning the type and availability of jobs that the claimant could perform. Ms. Kehr testified that claimant's work experience as a mold machine operator would be classified as a plastics trimmer, and her other work would be classified as a fast food worker. The vocational expert testified that the plastics trimmer position would be medium, semiskilled work, and the fast food worker position would be light, unskilled work. (R. 35-37).

The ALJ asked the vocational expert whether a hypothetical individual of the claimant's age, education, and work experience could work in a fast food position, with the following limitations: light work; only occasionally crouching, crawling, stooping, or kneeling; and no climbing ladders. The vocational expert responded that this individual would be capable of working in a fast food position. The vocational expert testified that the individual could be off task no more than 15 percent of the work day as a fast food worker and still maintain employment. (R. 37).

---

[6] The court notes that the court reporter incorrectly refers to the vocational expert as "Brianne O'Hare" in the transcript of the ALJ Hearing. (R. 35). The vocational expert's name is actually GleeAnn Kehr. (R. 79).

*The ALJ's Decision*

On July 24, 2012, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 8). First, the ALJ found that the claimant met the non-disability requirements for disabled widow's benefits under section 202(e) of the Social Security Act through the prescribed period ending October 31, 2017. (R. 13).

Second, the ALJ found that the claimant had not engaged in substantial gainful activity since her amended alleged onset date of October 13, 2010. (R. 13).

Next, the ALJ found that the claimant had the severe impairments of degenerative disc disease of the lumbar spine, arthritis, headaches, and hypertension. The ALJ found that these conditions more than minimally impacted the claimant's ability to lift, carry, crouch, crawl, stoop, kneel, climb, understand, and remember. The ALJ found that the claimant's history of a substance abuse was a non-severe impairment because the claimant had maintained her sobriety for over a year, and her medical records did not indicate any limitations resulting from her drug use. (R. 13-14).

The ALJ next determined that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ considered whether the claimant met the criteria for listing 1.04 concerning disorders of the spine, and found that the claimant did not meet the criteria for this listing because her medical record did not demonstrate compromise of a nerve root or the spinal cord with additional findings of evidence of nerve root compression, limitation of motion of the spine, or motor loss.

Finally, the ALJ determined that the claimant had the residual functional capacity to

perform light, unskilled work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), with only occasional crouching, crawling, stooping, and kneeling, and no climbing ladders. In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence. (R. 14-15).

The ALJ found that the objective medical evidence supported the claimant's diagnosis of severe degenerative disc disease.  She relied on a February 2011 lumbar x-ray that demonstrated severe degenerative disc disease with facet arthrosis at L5-S1. (R. 270). This x-ray was consistent with the claimant's allegations of pain in her lumbar spine. Based on this evidence, the ALJ limited the claimant to light work, with only occasional crouching, crawling, stooping, and kneeling, and no climbing stairs. (R. 15).

The ALJ also found that the objective medical evidence supported the claimant's complaints of pain in the hands and wrists bilaterally.  She found objective medical support in a June 2010 physical exam, which revealed tightness in the claimant's CMC (carpometacarpal) joints bilaterally. She also found support in the claimant's diagnosis of osteoarthritis of the first metatarsalphalangeal joint from her treating source at Birmingham Health Care. (R. 237).

The ALJ also cited the claimant's February 2011 consultative physical exam, in which Dr. Martin Gill noted that the claimant had 4-5/5 strength in her hands bilaterally and difficulty squatting. (R. 268-271). The ALJ concluded that based on this objective medical evidence, the claimant should be limited to light work, with only occasional crouching, crawling, stooping and

16

kneeling, and no climbing stairs. (R. 15-16).

The ALJ also limited to the claimant to light work because of a February 25, 2011 treatment note from Good Samaritan Health Clinic that characterized the claimant's hypertension as severe. (R. 16, 290).

The ALJ considered the claimant's allegations of constant headaches. The ALJ concluded that the claimant should be limited to unskilled work, as the pain may interfere with her ability to perform more strenuous mental demands. The ALJ did not find, however, that the frequency of the claimant's headaches was consistent with the objective medical evidence. The ALJ stated that "[t]reatment notes fail to show frequent complaints of headache from the claimant." Consequently, the ALJ concluded that the claimant's headaches would not take her off-task more than 15% of the workday. (R. 16).

The ALJ found that many of the claimant's other subjective complaints conflicted with the objective medical evidence. The claimant alleged that she could sit for thirty minutes at a time, could stand for less than twenty minutes at a time, and could walk for twenty minutes at a time. The claimant testified that she had problems sitting, standing, and walking because of her back and lower extremity pain; she had trouble climbing stairs and picking up items from the floor. The ALJ found that these allegations conflicted with the findings of the February 17, 2011 consultative exam, in which Dr. Martin Gill determined that the claimant had a normal gait, full range of motion of the joints, no joint tenderness, and 5/5 strength in the bilateral lower extremities. Dr. Gill also indicated that the claimant could close her hands into a fist and oppose her thumbs to all fingers bilaterally. (R. 268-71). The ALJ also considered a June 14, 2010 treatment note from Birmingham Health Care that stated that the claimant had only mild

17

tightness in the CMC joints bilaterally, and a May 8, 2012 treatment note from Good Samaritan Health Clinic that stated the claimant's hypertension was controlled.  (R. 237, 273). The ALJ concluded that these medical records rendered the claimant's allegations of disability less than fully credible. (R. 16).

The ALJ also cited the claimant's testimony at the hearing that she did not have any problems engaging in fine or gross manipulation for her conclusion that the claimant did not experience any manipulative limitations. (R. 16).

Additionally, the ALJ considered the claimant's current treatment plans for her impairments.  She noted that the claimant testified that she takes medication for her blood pressure, allergies, headaches, muscle spasms, and the pain medication Ultram. The ALJ noted, however, that the medical evidence did not indicate that the claimant had undergone any actual treatment for her impairments. The ALJ consequently concluded that the claimant's medication regimen and treatment history, or lack thereof, did not support the presence of impairments more limiting than those which she had already recognized. (R. 16).

The ALJ concluded that the claimant's limited daily activities were not strong evidence in favor of finding the claimant disabled. First, she stated that the allegedly limited daily activities could not be objectively verified.  Second, the ALJ stated that even if the claimant's daily activities were as limited as she alleged, she could not attribute those limitations to the claimant's impairments, rather than to other reasons, given the relatively weak medical evidence contained in her record. (R. 16-17).

The ALJ supported her conclusions by saying that the record did not contain an opinion from any treating or examining physician suggesting that the claimant was disabled or had

18

limitations greater than those that she recognized. Accordingly, the ALJ determined that the objective medical evidence supported her findings on the claimant's residual functional capacity and ability to do light, unskilled work. (R. 17).

Finally, the ALJ determined that the claimant was capable of performing her past relevant work as a fast food worker. The ALJ relied on the testimony of the vocational expert, Ms. GleeAnn Kehr, for her conclusion that the claimant could perform the position of a fast food worker both as it was actually performed by the claimant and as generally performed in the national economy. (R. 17).

Accordingly, the ALJ determined that the claimant was not disabled as defined by the Social Security Act. (R. 17).

## VI. DISCUSSION

The claimant argues that the ALJ improperly discredited the claimant's subjective complaints of pain and characterizations of her physical limitations. To the contrary, this court finds that substantial evidence supports the ALJ's findings and that she applied the appropriate legal standards to her evaluation of the claimant's subjective complaints and allegations of pain.

A Commissioner evaluating a claimant's pain and other subjective complaints must first consider whether the claimant demonstrated an underlying medical condition. *Holt*, 921 F.2d at 1223; *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529. If the claimant demonstrates an underlying medical condition, the Commissioner must then determine if any objective medical evidence confirms the severity of the alleged pain, or if the underlying medical condition has been objectively confirmed and is so severe that one could reasonably expect it to give rise to the alleged pain. *Id.* Subjective testimony can satisfy the pain

19

standard if the testimony is supported by objective medical evidence. *Foote*, 67 F.3d at 1561.

The ALJ must articulate reasons for discrediting the claimant's subjective testimony. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). The reasons articulated for discrediting the claimant's testimony may include the claimant's daily activities. *Harwell*, 735 F.2d at 1293. However, if the ALJ does not articulate reasons, the court must accept the claimant's testimony as true. *Holt*, 921 F.2d at 1236.

The ALJ in the present case properly articulated her reasons for discrediting the claimant's testimony about her pain and characterization of her physical capabilities. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence. (R. 15). The ALJ set forth several reasons for finding the claimant's allegations inconsistent with the evidence. She found that the objective medical evidence conflicted with the claimant's allegations. Specifically, the ALJ noted that Dr. Gill, in his February 17, 2011 consultative physical exam, indicated that the claimant had a full range of motion of the joint, no joint tenderness, and 5/5 strength in the bilateral lower extremities. Dr. Gill also noted that the claimant could close her hands into a fist and oppose her thumbs to all her fingers bilaterally. (R. 16, 270-72). The ALJ also relied on the June 14, 2010 treatment note from Birmingham Health Care that indicated that the claimant had only mild tightness of the CMC joints bilaterally. (R. 16, 237). Additionally, the ALJ mentioned the May 8, 2012 treatment note from Good Samaritan Health Clinic that stated that the claimant's hypertension was at goal, as further evidence that the claimant's allegations were not fully consistent with the record. (R. 16, 273). The ALJ concluded that these records rendered the

claimant's allegations less than fully credible.

The ALJ also discredited the claimant's characterizations of her allegedly limited daily activities. The ALJ did not consider the claimant's daily activities to be strong evidence in favor of finding the claimant disabled for two reasons. First, the claimant's allegedly limited daily activities could not be objectively verified with any reasonable degree of certainty. Second, the ALJ found that, because of the relatively weak medical evidence in the claimant's record, she could not conclusively state that the claimant's medical conditions were the source of the her alleged limitations. The ALJ, therefore, determined that the objective evidence outweighed the claimant's allegations regarding her daily activities.

The court finds that these reasons constitute substantial evidence to support the ALJ's determination that the claimant's complaints were not fully credible. Consequently, the ALJ properly discredited the claimant's subjective complaints.

## VII. CONCLUSION

For the reasons stated above, this court concludes that substantial evidence supports the Commissioner's decision. Accordingly, this court AFFIRMS the decision of the Commissioner. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 9th day of February, 2014.


_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE